## William H. Thomson *v.* William Hester et al.

1. **Fraudulent Conveyance.** *Creditor who may attack. Payment.*

   A party loses no right by a mere change in the form of his securities, and the holder of a new note given in exchange for an old one may attack a conveyance which would be fraudulent as to the old one.

2. **Same.** *Change in form of indebtedness. Case in judgment.*

   A note for $6,000, due to T. by H., antedated the fraudulent conveyance by H. to a trustee for his wife. S. held T.'s note for $1,480. H. and T. agreed that T. should assign his $6,000 note to S., in consideration that he should receive the $1,480 note and a new note by H. for $1,400. On receiving the $6,000 note, H. at once confessed judgment thereon to S., paid the attorney's fee, had the land sold under the execution and purchased by the fraudulent trustee by a credit on the judgment, S. being a mere figure-head in the transactions, and H. in reality having purchased from him the $1,480 note. After the judgment, H. made to T. the $1,400 note; but when T., having recovered judgment thereon, sought to subject the land, Mrs. H. claimed that he was a subseqent creditor. *Held*, that she acquired no new rights under the judicial sale, and her title rests only on the original fraudulent conveyance.

3. **Same.** *Consideration. Fraudulent in part.*

   A conveyance by a husband to his wife, partly on a real and partly on a fictitious consideration, is, as against existing creditors, valid as to the amount actually due, and void as to the excess.

4. **Husband and Wife.** *Interest on wife's money received by husband.*

   A wife's money received by her husband prior to the Code of 1857 may be repaid by him to her, with legal interest from its reception until one year after that Code went into effect; but on her money received by him after that Code, she is entitled to only the interest accruing the year preceding the accounting.

5. **Same.** *Rents and income of separate estate. Husband accountable, how far.*

   The Code of 1857, page 337, article 28, was erroneously construed in *Hill* v. *Bugg*,

52 Miss. 397, the proper construction of the *proviso* being that the husband is not required to account for the rents, profits, and income (including hire of slaves) of his wife's separate estate beyond the receipts of the last year next before he is called on to account.

APPEAL from the Chancery Court of Hinds County.

Hon. E. G. PEYTON, Chancellor.

The facts appear in the opinion of the court.

*Tim. E. Cooper*, for the appellant.

Two questions are presented by the record for adjudication:

1. Is the complainant, Thomson, a creditor whose debt was existing at the time of the conveyance.

2. Were the conveyances fraudulent?

An examination of the evidence will show that these two questions become merged into one, for the complainant asserts that the alleged payment of his debt, set up by the defendant, was really but a part of a scheme conceived by the defendants for the purpose of defrauding him.

What relationship exists between the parties to these transactions? Mrs. Hester is the debtor's wife, Smith his intimate friend, and Barber his brother-in-law. The pecuniary condition of the defendant is material, and it may be safely said that at the time of these transactions he was overwhelmed with debt. In this condition of affairs, Hester separated his debts into two classes — those which were moral obligations and those which were not. Of the first were the debts to his wife, his brother-in-law, and his intimate friend. Thomson's claim was one of the immoral obligations. To pay the former and evade the latter class the conveyance was agreed to be made. Hester having reached this conclusion, his wife insisted on a settlement, and he sat down to make, for the first time in his life, a written statement of the amount due her. This could have but one result. No man in his condition, with creditors holding large claims which were not moral obligations, and pressing for payment, ever came out of a settlement with his wife other than bankrupt. Hester was

55 MISS. — 42

found indebted to his wife $19,614.25, and, as a memento of the perfect fairness of the transaction, a written testimonial was drawn up and signed; it was also, sealed — probably to insure it a legal as well as moral consideration. The amount of his moral obligations having been reached, Hester conveyed all of his property to Barber, for the payment thereof, but, with a want of his former care, failed to express the trusts in the deed, or even to describe most of the property conveyed, except in general terms. This deed contains the false recital that its consideration was $23,000, and is on its face an absolute conveyance.

The conveyance to Barber, trustee for Mrs. Hester, being fraudulent and void as to existing creditors, Hester wanted a *bona-fide* debt of his own to sue himself with. Incident to the $6,000 Thomson debt was the right to attack the conveyance. So, Hester set about transforming Thomson from a prior into a subsequent creditor. It was necessary to have a name to represent the parts which a third person was supposed to act, so he took the name of Smith — a convenient name — which also appertained to his commission merchant and confidential friend. The face of the account of Smith & Co. against Hester shows that Smith began to waver a little in his faith in Hester's paying him, for, on the same day that he charges up the Thomson note, $1,481.16, he credits Hester with $1,500 cash paid in, the only large payment in money made by Hester during the whole of the dealings between them. The Thomson note was then indorsed by Smith & Co. to Hester. Hester proposed and Thomson agreed to take the $1,481.16 note, and a $1,400 note to be made by Hester, for the $6,000 note which he held against Hester. Thomson then delivered the $6,000 note, and received the $1,481.16 note.

The settlement between Hester and his wife is made up largely of items with which he is not chargeable. So that the conveyance is, at least, partially voluntary, and must be declared, *pro tanto*, void. *Willis* v. *Gattman*, 53 Miss. 721.

The marriage of the defendants William and Carrie Hester

was in October, 1845.   The marital rights of property were, therefore, governed by the act of 1839, as to all personal property in possession of the wife.   *Carter* v. *Carter,* 14 Smed. & M. 59.   Under this act the wife had a separate estate in the slaves owned by her before marriage ; but the usufruct belonged to the husband, and could not be taken away by subsequent legislation.   *Lyon* v. *Knott*, 4 Cushm. 548 ; *Cameron* v. *Cameron*, 7 Cushm. 112 ; *Olive* v. *Walton*, 7 Cushm. 220.   The personal property of the wife being governed by the laws of this state, she held such interest therein subsequent to her marriage as was conferred by the act of 1839. 14 Smed. & M. 99, 130.

The real estate being located in Virginia, the rights of the husband and wife thereto were governed by the laws of that state.   14 Smed. & M. 130.   Of these laws this court will take judicial notice.   Code 1871, sec. 805.   There was no law of Virginia changing the property rights of the husband in his wife's realty, and his interest was, therefore, governed by the common law.   Hester, then, was entitled to the rents of the land and to the hire or use of the slaves, and any promise to pay the wife for the same would be *nudum pactum.*   The defendants do not set up any such contract — only a general understanding that the separate property of the wife should go to her children.

But even if the property had been the separate estate of Mrs. Hester, Hester was liable to her only for the income for one year after the receipt of the same.   Code 1857, p. 337, art. 28.

*J. A. Brown*, on the same side.

Thomson was evidently sacrificed as an incident to the main design of defeating all the creditors.   Danger was to be apprehended from Thomson's claim so long as he had the right to attack the Barber conveyance ; and, that conveyance being void as to existing creditors, it was desirable to strengthen it by a judicial sale.

There is no question in this case about subsequent creditors; the consideration for the $1,400 note is admitted to antedate the conveyance. The question is whether Smith and Hester confederated to defeat Thomson of the right incident to his claim to attack the fraudulent conveyance.

Hester represented to Thomson that he was taking up the $6,000 note, and giving for it the Smith claim and the $1,400 note. Nothing was said to Thomson about a sale to Smith; but the indorsements on the $1,481.13 note indicated to him that Hester had bought it from Smith & Co. and indorsed it to him. Thomson could draw no other inference; and to permit Mrs. Hester now to claim that it was a sale to Smith & Co. would be to allow her to set up a fraud devised to protect her fraudulently-acquired title.

In one of these fraudulent assignment cases the court says (in *Johnston* v. *Lane*, 11 Gratt. 568), "Where the note was given for a pre-existing debt, that fact and the commencement of the debt may be shown in evidence."

The right to attack a fraudulent conveyance by the debtor is an incident of the debt. The change in the form of the debt does not destroy that right. If the note on which the judgment is founded be for a consideration which antedates the fraudulent conveyance, the bill can always be maintained. A scaling of the original debt, payment of half of it as scaled, and giving a new note in renewal of the other half, cannot destroy the right incident to the original debt to attack a fraudulent conveyance by the debtor. The sale of the $6,000 note by Thomson to Smith is a mere pretense. Thomson did not design to make any such transaction. Hester did not inform him that such was the arrangement; but this fact of a sale, if a fact, was concealed by Smith and by Hester from Thomson. But the truth is that neither Smith nor Hester understood it at the time as a sale to Smith. Archer and Thomson, and the books of Smith & Co., and the indorsement of the $1,481.13 note by Smith & Co. to Hester, and Hester's

subsequent indorsement thereof in blank, and all the other admitted facts, show that the transaction was with Hester, not with Smith, and the $1,400 note was a part renewal.

" No change of the evidence of the debt's existence can exert any influence on the rights of the parties." *Moore* v. *Spence*, 6 Ala. 506.    See, also, *Blue* v. *Penniston*, 27 Mo. 272 ; *Causler* v. *Salliss*, 54 Miss. 449 ; *Lowry* v. *Fisher*, 2 Bush, 74 ; *Gardner* v. *Baker*, 25 Iowa, 348 ; *Grover* v. *Wakeman*, 11 Wend. 202 ; *McLaughlin* v. *Bank*, 7 How. 228 ; *Cook* v. *Ligon*, 54 Miss.

*Shelton & Shelton*, for the appellees.

We do not argue that a change in the form of the debt — as, from an account to a debt, or from an old note to a new note — after a fraudulent conveyance will defeat the right of the creditor, or his assignee, to attack such conveyance.    But we do contend that by Thomson's assignment of Hester's old note to Smith & Co., for value, on October 18th, Thomson ceased to be a creditor of Hester as to the old debt, and when afterwards, on November 16th, Hester gave Thomson his note for $1,400 (if a debt at all), it was a new debt, and not a renewal *pro tanto* of the old.    41 Miss. 620 ; 22 Md. 391 ; 5 Iowa, 72 ; Story on Prom. Notes, 404–408.    To Smith & Co. belonged the whole of the old debt, with every right, legal and equitable, that could be predicated on it.    They had acquired it by purchase from Thomson for a valuable consideration.

At the time Hester gave the $1,400 note, Thomson having transferred the old note to Smith & Co., it was not in the power of Thomson or Hester, or both, by any contract or agreement or note, to reserve to Thomson (as against other persons) any equity he might have had against the property before he transferred the old note to Smith & Co.

Again, Thomson's purpose in this suit is fraudulent.    When Thomson sold the old note to Smith & Co., they and Mrs. Hester owned the property involved in this suit.    The joint concern for farming purposes was supplied by Smith & Co.,

merchants, and conducted by William Hester, agent, and in that name. It owed Smith & Co. With Mrs. Hester's concurrence, Smith & Co. bought the debt, charged its price to the joint concern, and Hester, as he agreed, confessed judgment for the whole balance as security to Smith & Co. All this Thomson knew when he sold the old note to Smith & Co., and when Hester made the $1,400 note to him. He now says that when he sold to Smith & Co., Hester had promised him some indemnity for his losses, and afterwards gave him the $1,400 note on that promise, and promised to pay it when he was able. Hester denies the promise before sale to Smith & Co.; says that after the sale, at Thomson's request, he made the note, and told Thomson he would pay it if he ever made money enough, but he had nothing then; neither Smith & Co. nor Mrs. Hester ever heard of that note until long after. If, therefore, Thomson attempts to make that note more than a personal debt from its date, upon it to claim the equities of a debt existing before the sale of the old debt to Smith & Co., and on that ground he attacks Smith & Co. and Mrs. Hester, it is a fraud on them. It has doubtless defeated one object of the purchase — to avoid a lawsuit.

But it is argued that this purchase of his note was part of the fraud. There is no ground for it; but, if it were true, Thomson knew of the sale of March 20, 1869, and of Hester's indebtedness to Smith & Co. and to Barber, and he proves that he sold the old note to Smith & Co. for the very purpose of Hester's confessing judgment on it, and on a contract in which that confession of judgment was a very material part of the contract. He who knows a fraud is going on, and by contract aids it, is not damaged by the fraud.

As to the ownership of the money and slaves, the *corpus* of the property received in Mississippi from her father's estate, after her marriage in 1845, the act of 1839 secures to her all such property, real and personal. Hutch. Code, 496. It, however, by clause 4, gives to the husband control and management of her slaves, and the receipt of the proceeds of their

labor.    But the act of 1846 repeals clause 4, and provides that the products and proceeds of the labor of the slaves shall inure to her sole and separate use and benefit.    Hutch. Code, 498. And the act of 1857 secures to the wife every species and description of property, real and personal, and all moneys, rights, and credits.    Code 1857, p. 335, art. 23.    It also secures to her the products, profits, and income of either personal or real estate, and further provides that if the husband buy property with her money he shall hold it as trustee for her.    Code 1857, art. 24, p. 336.    And the act of 1867 enacts that if the husband convert to his own use the wife's property, it is a preferred debt.    Code 1867, p. 727.

These acts are decisive of Mrs. Hester's right to the money and property when they came to her or her husband — decisive as to his liability to her for her money or property which he converted to his own use — even if there had been no contract between him and her; but in this case there was a contract.

In the settlement of March 20, 1869, there was accounted for by Hester neither rents, profits, nor income received by Hester that had arisen from Mrs. Hester's property, but simply a debt or liability of Hester to his wife, really on a contract; but if it were not on a contract, it would be on an implied promise.

Under an agreement with the wife, Hester got the money for his own use (not hers), and agreed to pay interest on it; that was a loan, and created simply an interest-bearing debt.    Under the agreement he got the labor of her slaves for his own use (not hers) to work on his farms, he to secure for himself (not her) the profits and income of their labor, and he agreed to pay hire for them; that was a hiring, and created simply a debt for hire from year to year.    Hester was entitled to all the profits and income from both money and slaves; she, only to her debts and interest.    To such a liability the proviso to article 28 on page 237 of the Code of 1857 does not apply. Hester's liability is just the same as if he were not her husband; he is liable for a debt and interest, not for the rents,

profits, and income of his wife's estate received by him.   If he did not make a dollar profits out of her property, he is liable for the debt and interest ; if he made a hundred per cent, he was only liable for the debt and interest.   The said proviso does not apply to Mrs. Hester's debt against her husband, and the liability of her husband therefor was not annulled or limited thereby.

*Frank Johnston*, on the same side.

On the question whether Thomson had the right to attack the conveyance, argued that, while Hester does not express his meaning clearly, Thomson, by no means, in view of the fact of the transfer to Smith & Co., explains how his claim remained the old debt, with its form simply changed.   M. J. Smith, Thomson's witness, explains the matter with sufficient clearness.   Thomson owed Smith & Co. a large note, and William Hester owed Thomson a $6,000 note, which antedated the conveyance.   Smith & Co. bought the Hester note from Thomson, giving Thomson in exchange his own note. It was agreed that Hester was to confess judgment on the note in favor of Smith & Co., which was done.   In the fall after the conveyances Hester gave Thomson a new note for $1,400.   Hester's explanation is that the consideration or reason for giving the note was that Thomson had not fared well in the exchange.

It seems to me clear that Smith & Co. became the holders and owners of the Hester note ; it merged in the judgment ; they owned the judgment, and, I presume, still own it.   Thomson ceased to have any interest in the Hester note assigned by him.   Whether Thomson made a good or a bad trade with Smith & Co. in getting up his own note, was no affair of Hester's.   Hester owed Thomson nothing, and there was, consequently, no consideration for the note.   There was no benefit or advantage arising from the new transaction known to the law as a valuable consideration.

It was, in any possible view, a new debt, coming into existence for the first time at the date of the $1,400 note.

It could not have been part of the old debt, for the whole

of that debt at the time was existing, and owned by Smith & Co.

I can see no possible connection between the new debt and the old debt which can give Thompson the *status* of a creditor holding a debt contemporaneous with the conveyance.

Even if the evidence was conflicting on this point, the conclusion of fact reached by the Chancery Court would be presumed to be correct, and would not be set aside unless clearly wrong.

CHALMERS, J., delivered the opinion of the court.

On March 20, 1869, William Hester, being insolvent, and intending to prefer certain creditors, conveyed to L. K. Barber, by a conveyance absolute upon its face, and for the nominal consideration of $31,000, all the property of which he was possessed, consisting of a plantation in Hinds County and another in Madison, with all the personal property on each, embracing large numbers of horses, cattle, etc., together with an undivided interest in large bodies of wild land in Adams, Yazoo, and Sunflower Counties in this state, and in the parish of East Feliciana, Louisiana.

The conveyance was made in payment and satisfaction of a debt of $3,000 due to Barber, who was the brother-in-law of the grantor, and of a debt of $8,000 due to Marshal J. Smith, his commission merchant and confidential friend, and of an alleged debt of $19,900 due to the wife of the grantor.

Barber at once made conveyances to Smith and Mrs. Hester of such undivided interests in the property as were agreed upon between the parties.

The original deed to Barber was recorded; those executed by him to Smith and Mrs. Hester were not. The debts due by Hester to Smith and Barber were genuine; that alleged to be due to his wife was grossly exaggerated, and the conveyance to her was, therefore, in great part, voluntary and fraudulent.

Appellant, Thomson, at this time, held a note against Hester, upon which there was due about $6,000, and which Hester

seems to have regarded as an unjust debt, because given, in part, for slaves.

In October, 1869, Hester told Thomson that he (Hester) was broke; that he intended to confess judgments in favor of Barber and Smith; and that the only chance for him (Thomson) to realize anything on his claim was through an arrangement with Smith, who held a note against Thomson, upon which was due about $1,480. Acting upon the suggestion, Thomson, Smith, and Hester made an arrangement by which Smith surrendered his note for $1,480 against Thomson, and the latter transferred to Smith the note for $6,000 which he held against Hester. To partly compensate Thomson for the great loss sustained in the exchange, Hester executed to Thomson a new note for $1,400.

The day after the $6,000 note of Hester was transferred to Smith, Hester confessed judgment on it in favor of Smith, and execution thereon having been levied upon the Hinds-county lands formerly owned by Hester, the same were bought in at the sale by Barber, in behalf of himself and Smith and Mrs. Hester, as he testifies, though the deed was made to him alone. By subsequent arrangements and conveyances between the parties Smith became the exclusive owner of the Madison-county plantation and personalty, Barber of the Louisiana lands, and Mrs. Hester of the Hinds-county plantation and personalty, and of the wild lands in other counties in this state. Several years afterwards Thomson recovered judgment against Hester on the note for $1,400 executed to him at the time of, or a few days after, the exchange of notes above detailed. *Nulla-bona* return having been had thereon, he filed this bill to attack and vacate the several conveyances by which Mrs. Hester had become the owner of the property in Hinds County, and to subject the same to his judgment.

It is insisted that the bill will not lie, because the note upon which his judgment is based was given after the execution of the deeds by which the property was conveyed first to Barber and then to Mrs. Hester, and that, therefore, Thomson, not

being a pre-existing creditor, cannot attack said conveyances.
We are satisfied that the note was intended to keep alive, *pro
tanto*, the original note, in part satisfaction of which it was
given ; and it is well settled that the holder of a new note given
in exchange for an old one may attack a conveyance which
would be fraudulent as to the old one, upon the principle that
a party loses no rights by a mere change in the form of his
securities. *Lowry* v. *Fisher*, 2 Bush, 74 ; *Gardner* v. *Baker*,
25 Iowa, 348 ; *Causler* v. *Salliss*, 54 Miss. 449. It is urged
that the doctrine does not apply here, because the old note
was transferred in its entirety to Smith, who had the right to
enforce it for the full amount due upon it ; so that there could
not be a right in Thomson to enforce the smaller note as
constituting part of the sum due on the first one. But both
Smith and Hester testify that though judgment was to be, and
was, confessed on the old note for the full amount in favor of
Smith, it was never intended to collect it in full. They both
say that it was to be held by Smith as a security, though
exactly what it was a security for is not apparent.

But Thomson did not know this, and he was informed at
the time he transferred it that judgment was to be confessed
upon it. Through this confessed judgment Mrs. Hester now
holds title. By his transfer Thomson must be held to have
consented to all legal advantages which could inure to any
purchaser or holder under the judgment, which he knew was
to be confessed ; and even though the scheme resulted in a
fraud upon him, he is estopped to complain by the maxim
"*Volenti non fit injuria.*"

If, therefore, Thomson actually transferred the note to
Smith, he cannot now attack the use to which he was advised
the latter intended to apply it ; and Mrs. Hester, as a sub-
purchaser under the judgment, will be protected, by reason of
such purchase, even though she paid nothing and her original
demand against her husband was fraudulent. The good title
acquired under the judgment to which Thomson had con-
sented will, as to him, cure the previous invalidities in her
title. *Fulton* v. *Woodman*, 54 Miss.

If, on the contrary, Smith had no real interest in the transaction, but simply lent the use of his name to enable Hester and wife to obtain title under a judgment based on an undisputed and *bona-fide* debt, and thereby bolster up and strengthen, as to her, the conveyance previously derived through Barber, there is nothing to prevent Thomson from attacking such title. Repeated and careful perusals of the voluminous and complicated facts detailed in the record satisfy us that the latter theory is the true one. Though the parties protest to the contrary, we cannot but regard Smith as a mere figure-head, who permitted his name to be used for the benefit of Mrs. Hester. It is not denied that the books of his mercantile house in New Orleans demonstrate this fact, but it is said that the books were so kept by his partner in ignorance of the true nature of the transaction. It is singular that he remained in ignorance of the showing made by his books for seven or eight years, but no ignorance upon the part of the book-keeper can explain away the facts that the Thomson note for $1,480, which it is pretended was surrendered directly to Thomson, was in truth, by Smith & Co., transferred in writing to Hester, and then by Hester indorsed in blank ; that forthwith Hester was charged with the exact amount of it on the books of Smith & Co., and on that same day he paid in the amount to the firm (with a slight excess) in cash, thus balancing the account and demonstrating that Smith had not lost or expended a cent in the matter, but had somehow become possessed of a note against Hester for $6,000 or more, upon which, the next day, a judgment was confessed. It is more remarkable still, if the note and confessed judgment belonged to Smith, that Hester should have paid the fee to the lawyer who drew it up, by a draft on Smith & Co., which was charged by them to Hester. The pretense that in all these matters Hester was acting as the agent of Barber and Smith is absurd in itself, and utterly overthrown by the facts in the record.

It is, indeed, impossible to imagine what use Smith could have for a note on Hester. Hester had already conveyed to him and Barber, and to his own wife, every dollar's worth of

property he owned, as Smith well knew, and by that conveyance had satisfied and paid every cent that he owed them. It is quite as difficult to discover what advantage could accrue to Barber or Smith by the levy of an execution upon, and a purchase by them of, land that already belonged to them by a conveyance many months older than the judgment. They say that it was done to prevent hostile attacks from adverse claimants. What danger they who had given up *bona-fide* debts could apprehend from such attacks, or how they strengthened their positions by a purchase under a junior judgment, we are unable to perceive. To Mrs. Hester, on the contrary, whose title was in great part fraudulent, the acquisition of a new one under a *bona-fide* debt was invaluable. Without pursuing further the numerous and complicated facts which conduce to our opinion, our conclusion is that the whole scheme was devised by Hester for the express purpose of vesting in his wife a title which would be invulnerable; that Smith had no real interest in the matter; that Mrs. Hester acquired no new rights under it; and that her claim now stands in exactly the same position that it occupied when, on March 20, 1869, she received, through Barber, a conveyance of property grossly in excess of the debt due her. That debt was fixed by her husband at $19,900. It was probably less than one-fifth that amount, and in so far as the property exceeded in value the amount really due, it is subject to the claims of creditors. *Gattman* v. *Willis*, 53 Miss. 721.

Mrs. Hester received from her father's estate, at sundry times, various sums of money. This her husband had a right to repay to her, except that portion of it which was by her invested in slaves. The money received previous to the adoption of the Code of 1857 will bear legal interest from the time of its reception until that Code went into effect, and one year afterwards; because, previous to that time, we had no law in this state restricting the right of the wife to demand interest from the husband to one year from the reception of it by him. Upon all sums received by the husband after that

Code took effect, she is entitled to one year's legal interest, to wit, the interest accruing the year preceding the accounting. Code 1857, p. 337, art. 28 ; Code 1871, sec. 1790. She is entitled to no hire for the negroes, because none was by the husband received within one year of the accounting.

We fell into the error, in *Hill* v. *Bugg*, 52 Miss. 397, of allowing a claim for negro hire received by the husband many years anterior to the accounting, and we now modify the opinion in that case in so far as it sanctions that result.

The decree is reversed and cause remanded, with the following directions : The sales under the executions will be enjoined. An account will be taken of the amount due Mrs. Hester, on the principles herein announced. A decree will then be entered requiring her to pay the amounts due on the judgments, in the order of their priority, in some short time to be named, in default of which the land will be sold, and the proceeds applied, first, to the satisfaction of the amount found due her, and then to the judgments according to their priority. She will be allowed to enforce the Eveline Harvey judgment to the extent only of $1,000 with interest ; but if the $1,000 paid by her upon such judgment is allowed her in the accounting before the commissioner, then such judgment will be treated as wholly extinguished.

Appellees will pay costs in both courts.

Let decree be entered accordingly.

CAMPBELL, J., concurring.

In *Hill* v. *Bugg* et al., 52 Miss. 397, we were called upon, as an incident to our decision of the main question in the case, to construe the proviso to article 28, page 337, of the Revised Code of 1857, and announced that it did not have the effect to bar the claim of the wife if not asserted in one year, but to subject the husband to liability for the income of the separate estate of his wife for one year after his receipt of her estate. In other words, that the proviso was not a statute of limitations to bar the wife, but a restriction of the liability of

the husband to liability to account for the income of her separate estate for only the first year after he received the estate. We misled ourselves by applying the word " same " to the separate estate, instead of to the words " rents, profits, or income.''

We have, without being thereunto moved by counsel, fully considered the matter, and avail of this opportunity to correct our former erroneous construction of the proviso mentioned, and to announce what we are satisfied is the true interpretation of it.

The doctrine of courts of equity, as stated by Story's Equity Jurisprudence, section 1396, is not, ordinarily, to require the husband to account for the income, profits, and dividends of his wife's separate estate beyond those received by him during the then last year next before he is called on for an account; and we think the manifest purpose of the proviso was to adopt this rule, and to bar the wife from holding the husband to an account for the rents, profits, or income of her separate estate after the expiration of one year from his receipt of such rents, profits, or income.

The rule of courts of equity stated above had not been adopted by the courts of this state, but was introduced by the proviso above mentioned.