JOHN ROBINSON ET AL. *v.* JACOB U. PAYNE ET AL.

1. MARRIED WOMAN. *Her rights in lands inherited. Acts of 1839 and 1846.*
   Sect. 1 of art. 4 of the act of 1839 (Hutch. Code, 496) in relation to married women provided that "Any married woman may become seized or possessed of any property, real or personal, by direct bequest, demise, gift, purchase, or *distribution*, in her own name, and as of her own property." The word "distribution," as used in this provision, applied as well to realty derived by descent as to personalty received from the estate of an ancestor; and by sect. 2, art. 7, of the act of 1846 (Hutch. Code, 498), the right to the rents, issues, and profits of realty thus acquired by a married woman was vested in her.

2. DEED. *Conflict between premises and habendum. Rule of construction.*
   A deed to Mrs. R. from her father recites in the premises, or granting part, a conveyance of certain lands "unto the said party of the second part, [Mrs. R.] her heirs and assigns forever." The *habendum* was in these words: "To have and to hold the above described lands so long as she may live; and in case of her decease, said lands to pass to the use and benefit of her child or children, and in case there be no offspring, she is at liberty to will away the above described lands." *Held*, that the granting part of this deed vested in the grantee (Mrs. R.) an estate in fee-simple, which could not be converted into a life-estate by the *habendum* because of the rule that where there is a clear repugnance and irreconcilable conflict between the granting and *habendum* clauses of a deed, as in this instance, the former must prevail.

3. MARRIED WOMAN. *Land bought by husband with her money. Trust under Code of 1857.*
   Where, under the Code of 1857, land purchased by a husband in his own name was paid for partly with his individual means, partly with the income from his wife's separate property accruing in her lifetime, and partly with the income from her property accruing after her death, the wife's interest in such land before her death was in such proportion as her means therein invested bore to the whole price; and as the income from her property after her death belonged to the husband as tenant by curtesy, her contribution to the purchase-money of the land was represented by the income accruing from her property in her lifetime and thus invested. And in a proceeding by the wife's heirs to establish the statutory trust against the husband in respect to land thus acquired, such trust cannot be imposed beyond the extent of the wife's interest as above stated.

4. SAME. *Trust in land bought by husband. Limitation of demand for account.*
   Art. 24, p. 336, of the Code of 1857 contained this provision: "If the husband shall purchase property in his own name with the money of the wife, he shall hold the same only as trustee for her use." A bill filed by the heirs of a deceased married woman to establish, under this statute, a trust in certain land purchased by her husband in his own name with the income from her separate property was resisted on the ground that the wife failed to

call on the husband for an account of her income thus invested within a year after the reception thereof, and that to compel a surrender of the land now, when her representatives cannot demand an account of the money with which it was bought, would be an evasion and violation of the proviso to art. 28, p. 337, of the Code of 1857, that "neither the husband nor his representatives shall be liable to account to the wife or her representatives for the rents, profits, or income arising from the separate property of the wife after the expiration of one year from the time of receiving the same." *Held*, that this proviso has no relation to the provision which makes the husband the trustee of the wife in respect to property bought with her money, but has reference solely to a money liability of the husband or his estate by reason of his consumption of her income.

APPEAL from the Chancery Court of Madison County.

Hon. E. G. PEYTON, Chancellor.

The case is stated in the opinion of the court.

*Nugent & McWillie*, for the appellants.

Relief was denied to appellants in the court below upon the ground that their bill was not filed within one year after the investment of their mother's money in the lands. The one year's statute, as applied to a proceeding to establish a trust in lands purchased with a married woman's money by her husband, is a fanciful conceit — a limitation created by the chancellor in the face of the statute which declares the trust. There is no analogy between the two provisions of the Married Woman's Act of 1857. Art. 24, p. 346, authorizes a married woman to purchase property with her own money, which she may have had at the time of her marriage, or which may have accrued to her afterwards as rents, issues, and profits, or otherwise, and take a conveyance in her own name, and in like manner hold and enjoy the same as her separate property; and provides that if the husband shall purchase property in his own name with the money of his wife, either that had at her marriage, or that realized afterwards as rents, etc., he shall hold the same as trustee for her. Nothing can be clearer than this; and no harm can result from the law because creditors of the husband who contracted or gave credit in consequence of the possession of the property purchased are protected. Art. 28, p. 337, applies to a wholly different case.

It relates to the husband's rights after the death of his wife, as tenant by the curtesy, and defines his interest in the estate personal; and the proviso to the article was intended wholly to protect the husband or his representatives against accounting to the widow or wife for arrears of income of more than one year's standing, and the husband against a like accounting to the wife's representatives. If the wife permitted the husband to receive this income, she must sue within a year if she desires to reclaim the money by the intervention of the courts.

It is one thing to sue for money had and received, or bring a bill for an account, and quite a different thing to establish a trust in land or personalty purchased with the wife's money. The Legislature did not intend to encourage appropriation of the wife's income by the limitation imposed upon his liability to account; it was not for the husband's advantage, but for the benefit of his creditors, or third parties. The purpose of the law, explicitly announced, was to secure the income to the wife, and not to give it to her husband. This explanation gives meaning to the positive enactment of the statute. The income belonged to the wife, and no lapse of time could make it his. If he retained it himself for more than a year, the husband could not be compelled to account to the wife; and in the absence of other proof, when the question of liability would arise collaterally, it might be held, as to creditors or purchasers for value, that the wife had given the income to the husband, because of the lapse of time. Even this may be questioned. *Allen* v. *Miles*, 7 Geo. 640.

It is said, however, that under the woman's law of 1846 the rents and profits of real estate descended appertained to the husband, because the word " descent " is omitted in the statute. Prior to 1846 these rents did appertain to the husband, under the fourth section of the act of 1839, the first section of which provided that " any married woman may become seized or possessed of any property, real or personal, by direct bequest, demise, [devise] gift, purchase, or distribution, in her own name, and as of her own property ; *pro-*

vided, the same does not come from her husband after coverture." By the act of 1846, the fourth section of the act of 1839 is repealed, and the husband is not allowed to take the rents and profits which belong to the wife — the rents and profits of all lands acquired under the act of 1839. It is clear that the word " distribution," under the act, is referred to *real* as well as personal property. The word is to be taken in its ordinary signification, and the sense is clear. 30 Miss. 163; 36 Miss. 649; 6 Geo. 25; 1 Shars. Black. 434; 2 Lomax's Dig. 2; Bouv. L. Dic., tit. " Title."

The next question to be decided is as to the proper construction of the deed from John Lowe, Jr., to his daughter, Mrs. Robinson. The chancellor and opposing counsel say Mrs. Robinson took the fee to the property conveyed; we say she took a life-estate, with fee-simple expectant. Much depends on this point. John Robinson and Jacob U. Payne, unadvised by counsel, both agreed that appellants had the right to the immediate possession of the Valley plantation on the death of their mother. Layman and lawyer alike, on reading the deed, would reach the same conclusion. That it was the *intention* of John Lowe, Jr., to give his daughter this plantation for life, with remainder in fee to her children, if she had any, and the fee or power to dispose of the fee by will if she did not have any children, is quite apparent. We unhesitatingly assert that it would challenge ordinary intelligence to dispute the proposition. We are not allowed to adopt the conscious conviction of our minds, however, because of some sanctified rules of construction applicable to the case. The chancellor says there must not be intuitional belief provoked by the whole deed. Well-defined rights, growing out of the instrument according to the intention of the donor, must be squared by rules. Language, as expressing thought and mental process, is to be measured by mathematical rules, and the fixed purpose of the ancestor and grandfather to provide for appellants and shelter them from the spendthrift habits of their father is deliberately stultified; the rule requires it. We do

not think there is any such rule. If we know a thing, we need·
no rule to ascertain it. Rules are devices by which we grope·
after the solution of problems of construction, and when they
lead to a result we are only saying what the rules work out,.
and not what is the fact. We are not satisfied even then that
the truth is told. We approximate it from sheer necessity,.
and, by the forced adjustment, admit our lack of certainty.
It was well said by the High Court of Errors and Appeals·
that the jurist who at this day plants himself upon a dogma
of bygone years, for which he is unable to render a reason, has
outlived the generation to which he properly belonged. 36
Miss. 648. Rules are good things in their place ; we resort to·
them when all is darkness, in order to reach the light. When
the light is blazing all around us, he would be a lunatic who·
would not be convinced of the fact unless you could prove it
by the application of syllogism. So with an instrument of·
writing. If, on its face, there be no sort of difficulty and no·
hesitation of mind until you invoke rules of construction,
what creates the doubt? Put yourself in the place of the
maker—determine his surroundings, divine his motive, re-
quire an unlettered draughtsman to prepare the deed—and
you will reach the proper conclusion. If a technical lawyer·
had drawn the deed, you might consider it differently. But
how do we proceed in the determination of the question of·
construction ? See 3 Washb. on Real Prop. 384, art. 24.

We understand the objective point to be the intention of the·
grantor. The rule is to ascertain and carry out that intention,
if that can be done without doing violence to some "positive·
rule of law." *Williams* v. *Claiborne*, 7 Smed. & M. 496 ;
*Litchfield* v. *Cudworth*, 15 Pick. 23 ; *Deering* v. *Long Wharf*,
25 Me. 51 ; *Mulford* v. *Le Franc*, 26 Cal. 88 ; 21 N. Y.179 ;
10 N. H. 305 ; 16 Conn. 474. See opinion of Marshall, C. J.,
in *Smith* v. *Bell*, 6 Pet. 74 *et seq*.

If this intention can be clearly ascertained from the instru-
ment under examination, it must be carried into effect. The·
courts have rationally gone to great lengths to apply this rule..

An entire clause in a deed may be rejected where, from un-avoidable necessity, it is required to give effect to the intention of the parties manifested on the face of the whole instrument. *Alton* v. *Illinois Transp. Co.*, 12 Ill. 28. The grammatical sense of a deed cannot be adhered to when a contrary intent is apparent; and the particular intent will be made to govern the general intent. *Jackson* v. *Topping*, 1 Wend. 388; *Hancock* v. *Watson*, 18 Cal. 137; *Dawes* v. *Prentice*, 16 Pick. 435. General words will be restrained by a particular recital, when such recital is used by way of limitation or restriction. *Moore* v. *Griffin*, 22 Me. 350. If the intention of a deed is clear, any part inconsistent with it will be rejected as false or mistaken. *Emerson* v. *White*, 29 N. H. 482. Too much stress is not to be laid on the strict and precise meaning of words when the intention is manifest. The construction must be made on the entire instrument. It is said the premises of a deed will control if it is impossible to reconcile them with the *habendum*, but the law will rather *invert* the words than *pervert* the sense. 3 Ark. 18; 15 Mo. 63. But words repugnant and plainly at variance with the general intention of an instrument should be rejected. 2 N. H. 175; 2 Metc. 41; 1 Dev. 237; 1 Nev. 283; 28 Mo. 478.

How do you ascertain the intention? We answer, from the whole deed. If you read it through, and are persuaded as to the intention of the grantor, there is no room for rules. The end is attained; that intent must be consummated at all hazards. It is only when the intention is doubtful that you invoke rules to find or ascertain it. You can never be allowed to conjure up doubts by invoking rules, and then resort to the rules to dissipate the doubts.

If the lands had been granted to Sarah Robinson and her heirs, *habendum* to her and the heirs of her body, there could be no doubt that she took an estate tail, notwithstanding the premises vested a fee-simple. Co. Lit. 21 a; Cruise's Dig., sects. 74–90. Is the case here different? The deed was to Sarah Lowe, her heirs and assigns; *habendum* to her for life,

and at her death to go to the use of her children, and if she had none she was to have the power to devise the estate. What are children but heirs of her body? No plainer or simpler form for the conveyance could have been devised under our statutes or at common law. Certainly the grantor did not intend to grant the whole property absolutely to his daughter, so as to subject it to the dominion of her husband and deprive his future grandchildren of it. About the time of its execution, Robinson had taken the "Wildy Field" title to himself. He was somewhat of a spendthrift, inattentive to business, and taking the world easy. It was quite reasonable, therefore, that the lands should be granted so as to protect the grandchildren and preserve the estate granted. At any rate, that purpose is apparent on the face of the deed, and should be effectuated. The objection against it is purely technical, and to subserve the intention of the parties the words "heirs and assigns" should be considered as "false or mistaken." Had the deed been to John Robinson and his heirs, in trust; that he was to hold the land for Sarah Robinson for life, and after her death for the use of his children in fee, etc., there could be no difficulty; why is there any here? The grantee and heirs were to stand seized of the land for the use of the grantee for life, and the heirs of her body after her death. The whole debate resolves itself into the question as to whether an estate tail, with fee-simple expectant, is totally contradictory of, or repugnant to, an estate in fee. That has been expressly decided, and would seem not to be a debatable question. 20 Pick. 516. The general word "heirs" in the premises is explained by the word "children" in the *habendum*—"if children, then heirs." The word "assigns" has reference to the words "will it away," in the *habendum*.

The children took as purchasers, though they were "heirs," as described in the premises of the deed. "The word 'children,' in a technical as well as a general sense, is used as a word of purchase; as a description of persons, and not as a word of limitation. * * * Although the estate be limited

to the children after the death of their father, without words
of limitation superadded, yet it is believed they take the fee
under our statute.  *  *  *  Hutch. Code, 609, sect. 23.
The fee is limited by way of contingent remainder, and vested
in the children as they come *in esse;* the estate to open and let
in the children as they are born." *Selser* v. *Hubbard*, 44
Miss. 705 ; *Sisson* v. *Seabury*, 1 Sumn. 235 ; 44 Miss. 712,
713.

If we are right here, there would seem to be no necessary
and irreconcilable conflict between the premises and *habendum*
of the Lowe deed.  The grantor intended the children to be
" heirs," and that the estate should go to them upon the death
of their mother.  Any other hypothesis must involve the
obliteration of the whole *habendum* of the deed.  On the con-
trary, the contemporaneous construction of the deed by the
parties must be accepted as pointing to the real meaning and
intention of Lowe, and giving appellants the estate contended
for by us.  We refer to some cases sustaining our view.  *Car-
son* v. *McCaslin*, 60 Ind. 334 ; *Prior* v. *Quackenbush*, 29 Ind.
475 ; *Colby* v. *Colby*, 28 Vt. 10 ; *Hafner* v. *Irwin*, 4 Dev. &
B. 434 ; Co. Lit. 26 b, note 1 ; *Wager* v. *Wager*, 1 Serg & R.
380 ; *Pilsworth* v. *Pyat*, T. Jones, 4.

*W. L. Nugent*, of counsel for the appellants, argued the
case orally.

*W. P. Harris*, for the appellees.

We maintain that the deed of 1851, from John Lowe to his
daughter, Mrs. Robinson, conveyed to her an estate of inheri-
tance in fee-simple, and that her husband, surviving, took a
life-estate in the Valley place, as tenant by the curtesy, and
was therefore entitled to the products during his life.

It will be perceived that there is between the words of the
granting part of the deed and the *habendum* a direct conflict in
two important respects : First, the *habendum* cuts down an in-
heritance in fee-simple, vested by the granting part, to a life-
estate in the grantee ; second, though the granting clause divests
the grantor of all his estate in the property, by words which

leave nothing in him, — words which convey the whole fee to
the daughter, — the *habendum* takes back the fee, or prevents
it from vesting in the daughter.   See 1 Shep. Touch. 79.

To give this effect to the *habendum* violates two established
rules for the construction of deeds : First, that the granting
part of a deed shall not be displaced by an after-clause or
*habendum* in conflict with it ; second, that deeds shall be con-
strued, in all cases of conflicting expressions or doubtful
meaning, most strongly in favor of the grantee and against
the grantor.   Nothing can be more certain than the force of
the terms used in the granting part.   They are the terms uni-
versally accepted as showing that the grantor intended by
them to part with his whole estate in the thing granted, and
they are the terms universally accepted as vesting an estate of
inheritance in fee in the grantee.   There is not a doubtful
word in the whole granting-clause.   There are no contradic-
tory terms, no qualifying words.

We are asked, therefore, to overturn settled rules of con-
struction which, though admitted to be technical and artificial,
or arbitrary, have been held necessary to give effect to deeds
made doubtful by conflicting provisions or terms of uncer-
tain signification, to wit : that the deed is to be taken most
strongly against the grantor ; and that when the *habendum* or
any after-clause conflicts with the prior granting-clause, the
first shall prevail and the last shall be rejected.

An examination of reported cases and the comments of
text-writers on the rule, from the earliest to the latest, enables
us to state with entire accuracy that no case can be found
(unless the stray case in 60 Ind. 339 is an exception ) and no
text produced that affirms that when the granting part of a
deed gives an inheritance in fee-simple, in language free from
any doubt, — in language recognized by the common law as
creating an estate of inheritance, no more and no less, — it may
be cut down by the *habendum*, or any after-clause, to an estate
not of inheritance.   See 4 Cruise's Dig., tit. "Title-Deed,"
200, chap. 20, sect. 76 ; 2 Lomax's Dig. 188 ; 3 Washb. on

Real Prop. 372, sect. 61; 4 Kent's Comm. 468. We cite cases: *Budd* v. *Brooke*, 3 Gill, 235; *Farquharson* v. *Eichelberger*, 15 Md. 63; *Winter* v. *Gersuch* (Sup. Ct. Md.), Reporter, 307, September 3, 1879. Where no estate is expressly limited in the granting part, the *habendum* may declare it, as a lease to A., no term specified, *habendum* to him and his heirs. 9 Allen, 168; 44 Me. 415; 2 Root, 205; 4 Dev. & B. 431. The *habendum* may explain what needs explanation. 3 Washb. on Real Prop. 372, sect. 61. But where there is no ambiguity in the premises, and words of established meaning are used, — as, "to A. and his heirs and assigns forever," — if the *habendum* takes from the grantee the inheritable quality of the estate and reduces it to a life-estate, or less, it is repugnant and void.

We conclude by saying that all the rules of construction are in the main artificial, but they are indispensable. They are rules of property, and the reason on which they stand is, that it is better to go by a rule than a guess.

The doctrine of courts of equity, unaffected by statute, was that, even in the special cases in which a husband could be called to account for the income of his wife's separate estate, he was not liable to account after one year from the date of the receipt of such income. Generally, he was not liable at all when he was tacitly or expressly allowed to receive and use the income, and never after her death could her representatives claim an account. Tyler on Inf. & Cov. 451, 645; 2 Story's Eq. Jur., sect. 1396. There was always a distinction between the *corpus* and the income of the separate estate. See case under New York statutes, 28 Barb. 622. The New York statute is just as broad as the act of 1846, as to income. It is given in the case cited. Perry on Tr., sect. 679.

The act of 1839 was construed not to take from the husband the income of the separate estate. Independent of the language of the act, it was held that the *corpus* of the property alone was preserved to her, and that the income belonged to the husband and might be subjected to his debts. *Grand Gulf Bank* v. *Barnes*, 2 Smed. & M. 165. This construction of

the act led to the amendment of 1846, which secured the income to her against the husband's creditors. The matter of the husband's responsibility for the income received and used by him was not touched. The Code of 1857 limited the accountability of the husband, in cases where he was accountable at all, to one year after the receipt by him of such income. This affirms the old rule on the subject. *Thomson* v. *Hester*, 55 Miss. 656; *Brooks* v. *Shelton*, 54 Miss. 353; *Coleman* v. *Semmes*, 56 Miss. 321.

If we take the case, therefore, of the husband using income, after a year from the date of its receipt, in the purchase of property or the payment of a debt contracted in its purchase, not having been called to account for it within the time prescribed, it is clear he cannot be required to refund the money or surrender the property; and it necessarily follows that if he, within a year of its receipt, invests it in his own name, and is not called to account within the year, he cannot be compelled to surrender the investment; because, if he had the money in his pocket, he could not be required to pay it. It becomes his by operation of law, and so does the investment in property. A trustee who is not accountable is a trustee not liable. To compel the surrender of the property would be an accounting, contrary to the true import of the statute.

It follows from this plain statement of the law that payments out of income more than one year prior to the death of Mrs. Robinson cannot be relied on as creating any trust in property in which it was invested by the husband in his own name, because he stands exempt from any kind of accountability for it; and it is equally clear that payments out of income after her death cannot be resorted to for such purpose.

*W. P. Harris* also made an oral argument.

*Shelton & Shelton*, on the same side.

1. In the Valley plantation John Robinson had an estate by curtesy.

For complainants it is urged that the deed defeated the

curtesy, because, say they, it gave Mrs. Robinson but a life-estate, with remainder to her children surviving her, if any, but if none, " she was at liberty to will it away as she might wish." We controvert that position.

Complainants say that the *habendum* in this deed destroys the hereditary character of the estate granted, and therefore defeats the curtesy. We think not.

Now, one or the other of two propositions must be correct. Either the grant and the *habendum* are repugnant, in which case the *habendum* must yield and the grant stand, or, if not repugnant, they must be so held by a construction that does not violate either the grant or the *habendum*. We think that in this case the first proposition is the true one. If the *habendum* is so repugnant to the grant that both cannot stand, the *habendum* must yield and the grant take effect as written in the deed.

While it is true that the office of an *habendum* is to limit and define the estate which the donee takes by the grant written in the deed, yet it cannot limit or define away the estate granted by the terms of the grant, nor limit nor define into existence an estate not in the grant. It cannot limit or define in repugnance to the grant, but may in consistence with it ; so far as it is repugnant, it is of no validity or effect. 2 Bla. Comm. 298 ; 2 Coke, 23 ; 8 Coke, 26 ; 4 Kent's Comm. 468 ; 3 Washb. on Real Prop. 372–374, and numerous authorities.

But suppose we concede that there can be a construction of the deed upon which the grant and the *habendum* can stand together, by limiting the character of the estate to Mrs. Robinson without making it repugnant to the grant, still no such construction could be given as would destroy the curtesy. We think that we verify this position beyond doubt or debate when we say that, so long as the construction does not destroy the hereditary character of Mrs. Robinson's estate under the grant, it does not impair the curtesy ; and when the construction destroys that hereditary character, the *habendum* so construed becomes repugnant to the terms of the grant,

and therefore the construction (or rather the *habendum* so construed) must yield, and the hereditary character of the estate stand, and so the curtesy stand.

2. Who, before Mrs. Robinson's death, on February 1, 1859, was entitled to the proceeds and profits of the lands she inherited from John Lowe, at his death, in February, 1853?

By the common law, the husband was jointly seized with the wife of her lands inherited in fee ; his estate was a freehold, and both before and after her death liable for his debts ; he could sell his estate and give possession of the land to his vendee ; that estate gave him control and management of the land, and he had the rents, issues and profits ; the wife had the hereditary title : the husband had everything else. 1 Washb. on Real Prop. 140, sect. 47.

The wife could not take land, or its proceeds and profits, separate and apart from her husband, because she could not render feudal service ; therefore, though the hereditary title was hers, the freehold and products were his, the possession joint, and he must render the feudal service. 1 Bishop's Mar. Wom. 794.

When, therefore, land and its use were conveyed by will or deed to a wife, separate and apart from her husband (which could not be done by inheritance), it had to be done through a trustee, and not by deed or devise directly to her. But equity in time innovated on that, and where land or its use was conveyed directly to a wife as her separate property, the equity courts would effectuate the separate character, according to the deed or will, by recognizing in the husband the common-law life-estate, but fixing on him a trust for his wife's separate use according to the true import of the will or deed. 1 Bishop's Mar. Wom. 792, 800–803 ; 2 Story's Eq. Jur., sect. 1380 ; 9 Paige, 363 ; 6 Serg. & R. 467 ; Tyler on Inf. & Cov., sect. 303.

To lands inherited by the wife, the common law applied. The equity rule did not and could not apply, for she could not inherit lands to her use separate and apart from her husband ;

such separate use could be created only by purchase in some form, not by inheritance. When, therefore, the will or deed conveyed directly to her as separate property, that separate character was in law no feature of the estate. In law, the husband had his life-estate, but the chancery rule made him use that life-estate in trust for his wife. Therefore this important conclusion, that as to the Hill and Douglass places, inherited by Mrs. Robinson in 1853, the chancery rule would not have given the separate use of them to her, and, apart from our statutes, Robinson was entitled to the products and profits of those two places.

How do the acts of 1839 and 1846 affect the above conclusion? and how does the act of 1857 affect it?

To the first branch of the question we answer, that the acts of 1839 and 1846 do not affect the conclusion at all, for these reasons : —

The first section of the act of 1839 practically interpolates the chancery rule into the law courts — that is, the wife was capable at common law to take and hold land, but not capable to take and hold it or its use separate from her husband ; the chancery rule effectuated in the chancery courts her separate use in cases to which that rule applied. The statute effectuated it to a limited extent in the law courts, in cases to which it applied ; the chancery rule applied only where the separate use was prescribed by a will or deed to the wife directly, and could not apply to the land inherited by her. We contend that sect. 1 of the act of 1839 has only a like application, and therefore does not apply to lands inherited by the wife. Hutch. Code, 496, art. 4, sect. 1 ; 26 Miss. 352.

We have shown that the chancery rule was applicable only where the wife's title was created by deed or will providing that the wife's estate and use was to be separate and apart from her husband, and had no application to land inherited by a married woman. The statute is the same. It applies only where the wife takes by " bequest, devise, [see 26 Miss. 352] gift, purchase " (or distribution?). It does not apply where

she takes by inheritance; it applies only when that bequest, etc., is " as her separate property ; " it does not apply unless it is so expressed in the will or deed. It applies only where the bequest, etc., is directly to her, and not to a trustee for her.

I think that the act of 1846 had no effect adverse to the husband's common-law rights in lands inherited by the wife during coverture.

Sect. 2 provides, as to lands acquired by the wife during coverture, " that the rents, issues, and profits of real estate of any married woman acquired by her subsequently to her marriage, under the provisions of the first section of the act of 1839, shall enure to the sole and separate use and benefit of such married woman." But I have shown that the first section of the act of 1839 has no application whatever to lands inherited by the wife during coverture, but only to those of which she becomes seized or possessed by direct bequest, devise, gift, or purchase.

To the second branch of the question we answer, that the act of 1857 does affect the common-law result so far as that act controls this case only. It affects it because that act cuts loose from the acts of 1839 and 1846, and takes a new departure, applicable to all of a wife's property, however and whenever acquired ; and, whether acquired by purchase or inheritance, makes it all, and its rents, issues, and profits, her property, separate and apart from her husband, and exempts them from liability for his debts. Code 1857, pp. 334, 335, arts. 23, 24. But it secures his common-law curtesy rights after her death. Art. 28.

The direct effect in this case is, that Robinson was entitled to the proceeds and profits of the Hill and Douglass places until that Code took effect, on November 1, 1857, and he was restored to the same rights on her death, January 31, 1859. If, therefore, we are right as to the acts of 1839 and 1846, but one crop (that of 1858) can be affected by the act of 1857.

*D. Shelton*, of counsel for the appellees, argued the case orally.

CHALMERS, C. J., delivered the opinion of the court.

This is a bill filed by the children of John Robinson and of his wife, Sarah Lowe Robinson, deceased, seeking to recover from Payne & Co. certain lands obtained by the latter under and by virtue of a judgment confessed by the father of complainants in favor of defendants. Complainants aver that these lands were bought by their father with the money of their mother, and the title taken in his name, in violation of her rights, and that therefore, by virtue of our statute, the lands were impressed with a trust in her favor, which they, as her heirs, are entitled to enforce against defendants. They claim rents for the lands, and also ownership of a large amount of cotton, valued at $30,000, which, as they allege, belonged to them, and the proceeds of which are in the hands of defendants.

Defendants admit possession of the lands, but claim to have obtained them in consequence of credit by them extended to the father of complainants while he was clothed with the legal title, and upon the faith of his apparent ownership, and in ignorance of the wife's equitable claim, if any she had.

As to the cotton sought to be recovered by complainants; they admit that it was received by them, but deny that it was the property of complainants, and state that their father, from whom they received it, was credited with it on his accounts.

With reference to the lands, two questions are presented : First, Was it bought by the husband with the money of the wife? Second, Did defendants extend credit to the husband upon the faith of the legal title held by him, and in ignorance of the wife's equitable ownership? It was undoubtedly bought in large part with the income arising from the wife's property, but whether under such circumstances as thereby made it the property of the wife, or entitled her or her children to fasten the statutory trust upon it, depends upon a careful and correct ascertainment of the facts attending its purchase, and the law applicable to those facts.

John Robinson, the father, a man of moderate means, the

owner of a plantation of a few hundred acres and perhaps a dozen slaves, intermarried, on the 26th of September, 1849, with Sarah Myra Lowe, the daughter and only child of John Lowe, one of the wealthiest planters in Madison County. Shortly after the marriage Mr. Lowe handed to Robinson $1,000, directing him to purchase with it a small tract of land adjoining his (Robinson's) own land, and to take the deed in his wife's name. Robinson made the investment, but took the title to himself.

In January, 1851, Lowe made to his daughter a deed conveying a plantation known as the Valley place, with all the slaves and personal property thereon. The language and legal effect of this deed will be hereafter noted and considered. Two years after the making of this deed,—to wit, in February, 1853,—John Lowe died intestate, his daughter, Mrs. Robinson, being his sole heir-at-law and distributee. She took by inheritance two large plantations, known respectively as the Hill and the Douglass places, together with several hundred slaves and several thousand dollars in money, all of which, including the lands, passed into the possession of her husband, who qualified as administrator. Lowe's estate owed but few debts, of insignificant amount. Within the next six years — that is to say, between Lowe's death, in 1853, and Mrs. Robinson's death, on the 31st of January, 1859 — John Robinson purchased, in rapid succession, three plantations, known respectively as the De Graffenreid, the Cockrell, and the Goodloe places, taking title in each instance to himself, paying therefor, together with the slaves purchased with the De Graffenreid place, about $125,000. None of them were paid for in cash at the time of purchase, but in short annual instalments, and mostly through drafts drawn on Payne & Co., the defendants in this suit, who were commission merchants residing in New Orleans, and the factors of Robinson. The drafts were met by shipments of cotton from all the plantations, to wit: from Robinson's own plantation (the Cottage place), from the plantation conveyed by Lowe to his daughter (the Valley place), from those inher-

ited by the wife (the Douglass and Hill places), and from the
places bought and held by Robinson in his own name — to wit,
the De Graffenreid, Cockrell and Goodloe places; in other
words, from the proceeds or income of all the property in Rob-
inson's possession, including his own as well as his wife's.
Much of the income arose and was received after Mrs. Robin-
son's death, and was applied to the liquidation of the indebted-
ness incurred to the commission merchants by reason of their
payment of Robinson's drafts.    To whom did this income
belong — as well that arising during the wife's life as that
received after her death?   Of course, the income from Robin-
son's own plantation, the Cottage place, always belonged
exclusively to him ; and in so far as it went to pay for the lands
purchased by Robinson in his own name, and sought here to
be recovered by the wife's heirs, no claim can be based
upon it.

The income from the place conveyed to his daughter by
Lowe (the Valley place), and from those inherited by her at
his death (the Douglass and Hill places), belonged to her dur-
ing her life, and after her death the income from the Hill and
Douglass places certainly belonged to the husband, who was
tenant by the curtesy as to them.   We reject the view urged
by counsel for the appellees that under the act of 1846 (Hutch.
Code, 498, sect. 2, art. 7) a married woman was not entitled
to the income arising from real estate inherited by her, but
only to that arising from personalty or from realty acquired
by gift, devise, or purchase.   The word " distribution," in
sect. 1 of the act of 1839 (Hutch. Code, 496), applies both to
personalty and to realty derived by descent, as is evident from
its connection and from the past adjudications of this court;
and by the act of 1846 (supra) the proceeds and income of such
property are vested in the wife.   30 Miss. 25 ; 32 Miss. 650.
The word is quite frequently so used, both in popular and in
legal parlance.

The income arising from the lands purchased by Robinson in
his own name (the De Graffenreid, Cockrell, and Goodloe

places) belonged, after the wife's death, to the husband as tenant by the curtesy, even though it could be shown that they were wholly bought with her means. During her life the income would belong to her, in such proportions as her means bore to the whole price paid for the lands.

With regard to the Valley place, the income arising from it during the life of the wife, as before remarked, belonged to her. Whether that arising after her death belonged to her husband or to her children depends upon whether the former had a curtesy in the land, and this depends upon the language of the deed executed to his daughter by John Lowe.

This deed, by the premise, or granting clause, plainly conveys to Mrs. Robinson an estate in fee, by granting and aliening the land " unto the said party of the second part, her heirs and assigns forever." A conveyance to a grantee and his " heirs " always gives an estate in fee-simple; and it has been said that no words are so apt and appropriate for this purpose as the word " heirs." 1 Washb. on Real Prop. 41–71; 1 Shars. Bla. Comm. 470.

Immediately following the premise, or granting clause of the deed, follows the *habendum*, whereby it is provided that the grantees (who are Mrs. Robinson " and her heirs and assigns forever ") " shall have and hold the above-mentioned negroes, etc., so long as she may live; and in case of her death, said land and negroes to pass to the use and benefit of her child or children; and in case of there being no offspring, she is at liberty to will away the above-described land and negroes as she may wish."

This seems plainly an attempt to convert the absolute fee conveyed by the granting clause into a life-estate by the *habendum*, which cannot be done. From the earliest times the decisions are uniform that where there is a clear and manifest repugnance between the premise and the *habendum* clauses of a deed, the former must prevail; and the doctrine is no less well recognized and maintained now than in the days of Coke and Sir Matthew Hale.

It gives way, of course, as all rules of construction must, where there is one clear and unmistakably expressed intention. Rules of construction are intended only to assist in ascertaining intention, and must not be perverted into defeating it; but where two repugnant intentions have been expressed with equal clearness in the instrument, some rule for construing it must be adopted. The wisdom of the rule is less important than its certainty, since men may differ as to the question of wisdom, but cannot err when the standard is definite and unmistakable, however arbitrary; indeed, the more arbitrary it is, the easier will it be of ascertainment. The particular rule under consideration here will not apply where but one plain intention can be deduced from the instrument as a whole, and that intention must prevail whether it be discovered in the first or last clause of the instrument; nor has it any application where no particular estate is expressed in the granting clause, so that the *habendum* may be regarded as fixing that which was before uncertain, or where the *habendum* enlarges the estate conveyed by the premise, or, speaking generally, wherever it can fairly be said that the effect of the *habendum* is merely to enlarge, or explain, or qualify the estate granted, without contradicting or nullifying it. But these are exceptional cases, or, to speak more properly, cases which do not really fall within the rule. The rule simply is, that where there is an irreconcilable conflict between the two clauses, the granting clause must prevail.

Such, we think, is the case before us. And hence it follows that the deed executed by Lowe to his daughter conveyed to her a fee-simple estate in the Valley place; that upon her death her husband held it as tenant by the curtesy, and was entitled, as such, to the rents and profits. 1 Shep. Touch. 74–76; 3 Washb. on Real Prop. 319, 372–374; 1 Shars. Bla. Comm. 625; 4 Kent's Comm. 468.

The lands in controversy, then, were bought in part with money arising from the husband's own property, in part with the proceeds of the wife's property, which, accruing during

her life, belonged to her, and in part with proceeds of the same accruing after her death, which belonged to the husband. The title to all of it was taken in his name.

Can the wife's heirs successfully assert a resulting, or rather the statutory trust upon this land, or such proportionate part of it as they can show to have been bought with her means? It can only be done, so far as her claim is based upon the statute, as to so much of the income as was invested after the adoption of the Code of 1857, when for the first time was adopted in our law the provision that "if the husband shall purchase property in his own name with the money of the wife, he shall hold the same as trustee for her use, but such trust shall be void as against creditors of the husband who contracted or gave credit in consequence of the possession of such property." Code 1857, p. 336, art. 24.

This provision has several times undergone investigation in this court, and was considered at some length in *Brooks* v. *Shelton*, 54 Miss. 358.

Before its adoption, the wife or her heirs could only maintain against the husband a claim for a resulting trust in property bought with her money upon the same terms as against a stranger. One of the cardinal requirements of the ordinary resulting trust, apart from any statute, is that the money invested must have been furnished contemporaneously with, or in advance of the purchase of the property upon which it is sought to fasten the trust.

Only the lands, therefore, which were bought with the proceeds of the wife's property between the adoption of the Code of 1857 and her death, on the 31st of January, 1859, came within the statutory trust. After her death the income belonged to the husband. Before the adoption of the Code of 1857 we had no such principle in our law, and the wife's claim of a resulting trust rested upon the same principle as that of a stranger, and had to be established by the same evidence. Whether the fact that the husband had general charge of the wife's estate would meet the requirement of a precedent ad-

vance of the money, when in fact the land was paid for with income arising after the purchase, is not necessary here to be decided.

It is insisted by the appellees, and held by the chancellor, that the bill was not maintainable at all, because of that provision of the statute which declares that " neither the husband nor his representatives shall be liable to account to the wife or her representatives for the rents, profits, or income arising from the separate property of the wife, after the expiration of one year from the time of receiving the same ; and in support of this view the case of *Thomson* v. *Hester*, 55 Miss. 670, is relied on.

Inasmuch as the present suit was brought more than one year after the reception of the wife's income, and portions of that income were probably held by the husband *in specie* more than one year before its investment in the land, it is insisted that to allow a maintenance of the bill would be to violate the provisions of this short and peremptory statute of limitations.

We cannot adopt this view. This clause of the statute has no relation to the clause which makes the husband the trustee of the wife as to all property bought with her money. It relates alone to a money liability sought to be imposed upon him or his estate by reason of his consumption of her income. Such liability must be asserted within a year, so as not to ruin him or bankrupt his estate by a claim for income which he has been permitted to use for his own expenses, or in the support of the family. The poor husband of a wealthy wife naturally lives in a style beyond that which his own circumstances would justify. For all family and personal expenses he is primarily liable. If the wife objects to this style of life, or to the application of her income towards maintaining it, she must give him timely admonition by promptly demanding her income at the end of each year. If she fails to do this, she will not be allowed after a long lapse of years to overwhelm him with ruin or absorb his estate, to the detriment of his creditors, by propounding her own stale demands. She will be conclusively

held to have consented to his appropriation of her income. Such was the origin and the reason of the equity rule on this subject, and such is the meaning of our statute.

But if the wife's income is invested by the husband in property in his own name, no principle of equity or justice would suggest that he be permitted to retain it, save by the expiration of a period after the dissolution of the marriage relation which would give him a title by limitation. He has simply robbed her to enrich himself, and when she claims her own she attempts to impose no liability upon him or his estate. She seeks only to reclaim her own property, and even this she is debarred from if third persons have extended credit to him on the faith of the property. In no event, therefore, can anybody suffer injustice by the enforcement of her rights. In the present case the chancellor found as a matter of fact that defendants had extended credit to Robinson on the faith of this property in ignorance of the rights of the wife, and in this finding we agree with him. This is fatal to complainants' bill. If Payne is to be believed, there can be no doubt of this fact, and there seems nothing in the record to show that he swore falsely. Indeed, the very meagre proof on the subject rather tends to confirm than to overthrow his testimony on this point.

With regard to the two hundred and thirty-six bales of cotton, worth $30,000, the proceeds of which are claimed by the bill, and which is known in the record as the " Jiggitts cotton," complainants have failed to convince us, as they failed to convince the chancellor, that it was their property. We think that it was by Robinson's factors rightfully appropriated to his accounts.

Decree affirmed.